IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| CLIFFORD TALTON; CEDRIC BOOKER; JOHN DOBSON; ANNIES WHITE; EDDIE JONES; AND PARAQUAD, a Missouri non-profit corporation, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) No. 12-4163-CV-C-FJG ) |
| BRIAN KINKADE, ALYSON CAMPBELL and IAN McCASLIN, M.D., | ) ) ) |
| Defendants. | ) |

## ORDER

Currently pending before the Court is Plaintiffs' Motion for a Preliminary Inunction (Doc. # 3); Defendants' Motion to Dismiss for Failure to State a Claim (Doc. # 26); Plaintiffs' Motion for Leave to File Supplemental Declaration; Plaintiff's Motion to File Amended Complaint (Doc. # 40) and Plaintiffs' Motion to Expedite Hearing or Ruling (Doc. # 42).

### I. BACKGROUND

Plaintiffs are disabled, low-income Missouri residents who require dialysis services. Plaintiffs receive their health services through the Missouri Medicaid Program (also known as MO HealthNet) and the federal Medicare program. Before July 1, 2012, Missouri Medicaid paid for their transportation to dialysis centers three times per week. To be eligible for Medicaid, plaintiffs had to meet certain maximum income limits. Plaintiffs incomes are high enough, that they do not qualify for Medicaid without paying a monthly deductible called a "spend-down." Plaintiffs can meet this spend-down by

either sending in a check for the amount of the spend-down or incurring a medical expense for which they are financially responsible. Defendants state that in the past, a significant number of Missouri Department of Social Services employees misapplied federal law and counted a patient's entire bill towards their spend-down requirement, rather than applying only that portion for which the patient was personally responsible. Defendants state that plaintiffs were the beneficiaries of this "happy mistake" of the Department's. However, in October 2011, the Department became aware of this problem and began to change its policies and to promulgate a rule which complied with federal law. Under the new practice, which went into effect on July 1, 2012, plaintiffs are now responsible for paying their entire spend-down themselves. Once the spend-down is met, plaintiffs are eligible for Medicaid services.

On June 25, 2012, Plaintiffs filed a motion for a temporary restraining order, arguing that if the new rule were allowed to go into effect, they would lose their Medicaid covered transportation to dialysis centers and will be forced to go without their medically necessary treatments if they remain in a community setting. They argued that if they move into nursing homes or other institutions, then they will receive transportation to their dialysis appointments. Plaintiffs argue that the new policy violates the ADA and the Rehabilitation Act because it denies plaintiffs the opportunity to receive the same transportation services while staying in their own homes. On June 29, 2012, the Court denied plaintiffs' Motion for a Temporary Restraining Order. The Court now considers the plaintiffs' Motion for a Preliminary Injunction and defendants' Motion to Dismiss.

## II. STANDARDS

In determining a litigant's right to a preliminary injunction, the Court considers four factors: "(1) the threat of irreparable harm to the movant; (2) the state of balance

between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest." Roudachevski v. All-American Care Centers, Inc., 648 F.3d 701, 705 (8th Cir. 2011) (citing (Dataphase Systems. Inc. v. C.L. Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981)). In Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds, 530 F.3d 724 (8th Cir.2008), the Court stated that it was clarifying that when a party is seeking a preliminary injunction of the implementation of a state statute it "must demonstrate more than just a 'fair chance' that it will succeed on the merits. . . . If the party with the burden of proof makes a threshold showing that it is likely to prevail on the merits, the district court should then proceed to weigh the other Dataphase factors." Id. at 732. The Court noted that this "more rigorous standard 'reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.'" Id. (quoting Able v. United States, 44 F.3d 128, 131 (2d Cir. 1995)).

To survive a motion to dismiss under 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662,129 S.Ct. 1937,1949,173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A pleading that merely pleads "labels and conclusions" or a "formulaic recitation" of the elements of a cause of action, or "naked assertions" devoid of "further factual enhancement" will not suffice. Id. (quoting Twombly). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

at 1950. Under Fed. R. Civ. P. 12(b)(6) we must accept the plaintiff's factual allegations as true and grant all reasonable inferences in the plaintiff's favor. Phipps v. FDIC, 417 F.3d 1006, 1010 (8th Cir. 2005).

### III. DISCUSSION

**A. Motion for Preliminary Injunction**

**1. Probability of Success on the Merits**

a. Americans with Disabilities Act

Plaintiffs' claim that Defendants violated Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132. In Pettet v. May, 2:11-CV-04049-NKL, 2012 WL 1377101 (W.D. Mo. Apr. 19, 2012), the Court stated:

> Title II "prohibits discrimination in the services of public entities." Gorman v. Bartch, 152 F.3d 907, 911 (8th Cir.1998). To state a claim under the ADA, a plaintiff must show that "(1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of [the public entity's] services, programs, or activities, or was otherwise subjected to discrimination by the [entity]; and (3) that such exclusion, denial of benefits, or other discrimination, was by reason of his disability." Baribeau v. Minneapolis, 596 F.3d 465, 484 (8th Cir.2010).

Id. at *3.

b. Rehabilitation Act

In Hiltibran v. Levy, 10-4185-CV-C-NKL, 2010 WL 6825306 (W.D. Mo. Dec. 27, 2010), the Court stated:

> Section 504 of the Rehabilitation Act applies the same standards to entities that receive federal financial assistance: "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "The rights, procedures, and enforcement remedies under Title II are the same as under section 504." Layton v. Elder, 143 F.3d 469, 472 (8th Cir.1998) (citing Pottgen v. Mo. State High Sch. Activities Ass'n, 40 F.3d 926, 930 (8th Cir.1994)).

Id. at *4.

Plaintiffs argue that the new spend-down regulation will require their unnecessary institutionalization in order to receive the same services they could and have been receiving in their own homes. Plaintiffs state that they are likely to succeed on the merits because the "integration mandate" of the ADA and Section 504 prohibits unjustified and unnecessary institutionalization. In Olmstead v. L.C. ex. rel. Zimring, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), the Supreme Court stated:

> under Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

Id. at 607.

Plaintiffs argue that their risk of institutionalization is sufficient to demonstrate a state's violation of Title II of the ADA. In their Motion for Leave to File An Amended Complaint, plaintiffs seek to add Terry Childers as a party plaintiff. Plaintiffs state that in July 2012, Mr. Childers missed several dialysis treatments because he could not afford to meet his spend-down and as a result was hospitalized and admitted to a nursing home for five weeks, where he was able to obtain transportation to his dialysis treatments.

Plaintiffs argue that they are not asking for a fundamental alteration to programs and services, they are simply asking that they receive the same medically necessary services in a community setting, rather than in an institutionalized setting. Plaintiffs also argue that the methods of administration discriminate against them on the basis of their disability and that the defendants have failed to make reasonable accommodations to

5

policies, practices and procedures to avoid discrimination.

Defendants state that both the ADA and the Rehabilitation Act require that an individual be qualified or eligible to receive the services, thus this is a case about *eligibility for the services*, not access *to* the services. Defendants argue that the change in the rules will not limit plaintiffs' access to medically necessary services, once they become eligible to receive these services. Defendants state that plaintiffs are not eligible for any Medicaid services unless and until they meet their spend-down. The Olmstead decision defendants argue applies to "qualified individuals with a disability" which the ADA defines as an individual "who, with or without reasonable modifications to rules, policies or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Defendants argue that the correct comparison is between Medicaid eligible participants using the incurred-expense method, such as plaintiffs and participants using the pay-in method. Defendants state that those using the "pay-in" method have always been responsible for their entire spend-down, but that has not always been true of those utilizing the "incurred-expense" method.

Plaintiffs in reply argue that they are "qualified" because they are capable of living in a community setting. They argue that the relevant issue in the case is "whether Defendants place Plaintiffs at risk of needless institutionalization by making needed services available to them only if they move into a nursing home." (Plaintiffs' Reply Suggestions, p. 2).

Defendants argue that this is a case not about discrimination or about plaintiffs' risk of institutionalization, but rather it is a case about eligibility. Gloria Olson, Assistant Deputy Director Income Maintenance for the Family Support Division, Department of

6

Social Services, State of Missouri, states in her Affidavit that her Division completes eligibility determinations for programs that qualify individuals for Medicaid coverage. She states that beginning on July 1, 2005, for individuals and married couples who are Medicaid eligible based on old-age or disability, the income threshold for eligibility in Missouri is 85% of the Federal Poverty Level. As of April 2012, 85% of the poverty level was $792.00 per month for a single person and $1,072.00 for a married couple. If an individual or couples' adjusted gross income level is equal to or less than the income threshold, then the person or couple is eligible for Mo HealthNet coverage of services, including the cost of medically necessary transportation. If the individual or couples' income is greater than the threshold, then they must reduce their income down to the threshold level or "spend-down" their excess income before they are eligible for coverage of services. There are two ways of meeting the spend-down requirement. One way is the "pay-in" method. A participant mails in a check in the amount of the spend-down to the Department. The second method is the "incurred-expense" method. In this situation, a participant incurs a medically-related expense, such as medical treatment or transportation, presents the bill, and the amount they are responsible for is applied to their spend-down. Only when the entire spend-down has been met is a person eligible for Mo HealthNet coverage. In the past, the Department has not consistently applied this federal regulation and allowed expenses that were paid by a third-party to count toward an individual's spend-down. 42 C.F.R. § 435.121(f)(1)(iii).

The Court agrees with the position of the State. This is not a case about discrimination, this is a case about eligibility. In M.R. v. Dreyfus, No. 11-35026, 2012 WL 2218824 (9th Cir. 2011), amended (June 18, 2012), the dissenting opinion stated:

> What the Supreme Court held in Olmstead is that the disabled are

> discriminated against if states, without justification, provide services to the institutionalized that are not provided to community-based recipients, thus forcing certain individuals into institutionalized settings. See 527 U.S. at 597, 600-601. What Olmstead did *not* hold - indeed what it specifically stated it was *not holding* - was that any sort of a level of services must be provided to *prevent* institutionalization, else the recipient would suffer discrimination.

Id. at *5. The Court went on to note that "[t]he bottom line is simple enough: '[T]he disabilit[y] statutes do not guarantee any particular level of medical care for disabled persons, *nor assure maintenance of service previously provided.*" Rodriquez [v. City of New York, 197 F.3d 611, 619 (2nd Cir. 1999)] . . . yet 'maintenance of service previously provided' is exactly what our court requires in M.R." Id. at *8 (internal citations omitted).

This is also not a case like Hiltibran v. Levy, 793 F.Supp.2d 1108 (W.D.Mo. June 24, 2011),where the State was providing a product to one group or class of persons, but denied that product to another class. In that case, plaintiffs were all disabled, low-income individuals between the ages of 22 and 49. Due to their disabilities, the plaintiffs were incontinent. Plaintiffs' physicians had determined that it was necessary for them to use incontinence briefs in order to prevent skin infections and also to allow them to remain in the community. Missouri provides coverage of incontinence briefs to individuals between the ages of four and twenty. The per diem provided by the Missouri Medicaid program to those over the age of twenty-one and who reside in an institutional setting can be used to pay for the cost of incontinence briefs. When three of the plaintiffs turned twenty-one, the State refused claims for coverage of their incontinence supplies, arguing that they were personal hygiene items. Plaintiffs filed suit arguing that the State had violated the ADA and the Rehabilitation Act. In that case the defendants did not dispute that the plaintiffs met the Olmstead criteria. It was also undisputed that if plaintiffs were not eligible for a waiver program, they had to be institutionalized in order

8

to obtain Medicaid coverage of their incontinence briefs. Id. at 1116. The Court determined that the waiver program, which had been offered by the State as an alternative was insufficient, because not all the plaintiffs were eligible for the program, coverage was not guaranteed and there were caps on enrollment. Therefore, the Court determined that pursuant to Olmstead, the "[d]efendants are required to provide Medicaid coverage of incontinence briefs to non-institutionalized adults if they provide such coverage to institutionalized adults." Id.

The instant case is distinct from Hiltibran, because it is not a medical supply or a service that the State is providing to one group, but not to another. Ms. Olson notes in her Affidavit:

> MO HealthNet spend-down policy does not impact the availability of services. Instead, it determines whether a MO HeathNet participant is eligible to have his or her medical bills paid by MO HealthNet in that month. The community transportation services and personal care services will still be available. The Division does not control access to these community services.

(Olson Affidavit, ¶ 14).

In this case, the state is attempting to uniformly enforce a federal regulation regarding the spend-down requirement. In the past, plaintiffs had been the recipients of a fortuitous mistake, where expenses paid by a third party were counted toward an individual's spend-down requirement. Since discovering the mistake in October 2011, the Department began informing participants and providers of the inconsistency and changing its internal policies. (Olson Affidavit, ¶ ¶ 11-12). Recognizing concerns of providers and recipients, the Department delayed implementation of the change until July 1, 2012. However, the Department must consistently enforce its policies, or it could be found to be discriminating in favor of individuals who meet their spend-down via the

9

Case 2:12-cv-04163-FJG   Document 44   Filed 10/25/12   Page 9 of 15

incurred expense method (as plaintiffs were), versus the pay-in method.  Under the new practice, all Medicaid spend-down participants will be treated the same.

In the instant case, the plaintiffs will still be able to receive transportation services from their homes, once they meet the full amount of their spend-down requirement.  As defendants stated, "[t]he change in practice will not affect the services available to Medicaid participants; rather, the spend-down program will work as it always has, but plaintiffs will simply be responsible for their entire spend-down." (Defendants' Suggestions in Opposition, p. 3). This may cause them to pay more money out of their pockets, but the transportation services will still be available to plaintiffs, once they meet their spend-down requirements.  Accordingly, the Court finds that plaintiffs have not shown that it is likely that they will prevail on their ADA or Rehabilitation Act claims.  Thus, this factor weighs against granting a preliminary injunction.

### 2.  Threat of Irreparable Harm

Plaintiffs argue that if a temporary restraining order is not issued, they face the risk of serious deterioration of their health and physical conditions, institutionalization and even possible loss of life.  They state that these are harms which are not compensable by money damages.  Defendants argue that plaintiffs have admitted that they are eligible for Medicaid only on a spend-down basis and that this is the case regardless of whether the Department's new rule goes into effect. Defendants state that the plaintiffs will still be able to access their transportation services, it will just cost more than it did previously.  Additionally, defendants note that plaintiffs have known about this change since February 2012 and so have had time to make alternative transportation plans.  The Court agrees with defendants.  In October 2011, the Department realized that its employees were not correctly applying the law.  Originally, the change in

10

application of the rule was initially set to go into effect on May 1, 2012, but the defendants postponed this date to July 1, 2012, so that its employees could contact those affected individuals and explain the change in the policy.  While it is unfortunate that the plaintiffs will have to share more of the cost for their care, the Court does not find that plaintiffs are at risk of irreparable harm, because the services are not being taken away or denied to plaintiffs, it is just that their cost is increasing.  Additionally, as the Court noted in St. Marie v Ludeman, No. 09-3141 (JNE/AJB), 2010 WL 924420 (D.Minn. Mar. 11, 2010), the defendants would be harmed by an improper injunction of the administration of a state medical assistance program. "See New Motor Vehicle Bd. Of Cal. v. Orrin W. Fox Co., 434 U.S. 1345, 1351, 98 S.Ct. 359, 54 L.Ed.2d 439 (1977)(Rehnquist, J., as Circuit Justice)('[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.').  Although this harm is not dispositive, . . . it counterbalances the potential irreparable harm alleged by St. Marie." Id. at *4.  The Court finds that this factor weighs against granting a preliminary injunction.

### 3.  Balance of Harms

Plaintiffs argue that the balance of hardships weighs in their favor and they will suffer serious health related injury as a result of the loss of medically necessary dialysis that is critical to their health, safety and community living.  Plaintiffs state that it is not clear that the defendants will suffer any fiscal harm from an injunction.  Therefore, they argue that the harm to their health outweighs any potential budgetary issues of the defendants.  Defendants argue that the services are not being taken away and plaintiffs will remain eligible for Medicaid on the same basis as before, the only difference being that they will be held responsible for the entire spend-down each month.  If a preliminary

injunction is entered, defendants state that they will be violating federal law and will be required to treat Medicaid spend-down participants differently. The Court finds that the balance of harms weighs against entering a preliminary injunction.

### 4. Public Interest

Plaintiffs state that because defendants are in violation of the ADA and the Rehabilitation Act, entry of a preliminary injunction would be in the public interest. Defendants state that until recently, plaintiffs have benefitted from the Department's mistake. But, this is a mistake which violates federal law and treats Missouri citizens differently. Defendants state that it is in the public interest to correct this mistake and it has given plaintiffs and others in similar situations months to prepare for the change. The Court agrees with defendants and finds that it is not in the public interest to allow the continued misapplication of the law. Accordingly, the Court finds that the public interest factor weighs in favor of denying the motion for a Preliminary Injunction.

After consideration of all of the Dataphase factors, the Court hereby **DENIES** plaintiffs' Motion for a Preliminary Injunction (Doc. # 3).

### B. Defendants' Motion to Dismiss

In their Motion to Dismiss, defendants argue that the plaintiffs have failed to state a claim under the ADA and the Rehabilitation Act. Defendants state that the issue is eligibility and plaintiffs are asking the Court to alter the eligibility requirements for them. Defendants argue that plaintiffs have failed to state a claim under either the ADA or the Rehabilitation Act and their Complaint should be dismissed.

In response, plaintiffs state that they have sufficiently alleged that they are qualified individuals with disabilities, because they have shown that they have kidney disease and are substantially limited in one or more major life activities. Plaintiff's state

that for the purposes of the ADA's integration mandate, an individual is "qualified" if he or she is capable of living in a community setting. They also argue that they have shown that they are subjected to discrimination because they are at risk of being instutionalized. Plaintiffs also argue that they are not required to demonstrate a likelihood of success on the merits to survive a motion to dismiss, but are only required to state a plausible claim for relief in the Complaint.

Defendants state that plaintiffs are not being forced into nursing homes to receive medical transportation services. In fact, defendants state that nothing has changed about Missouri's Medicaid program except who must pay the spend-down. Before July 1, 2012, the plaintiffs had to meet their spend-down, but a third-party usually paid the spend-down. Now, plaintiffs still have to meet the spend-down, but plaintiffs are responsible for meeting it themselves. Defendants argue that they are not denying plaintiffs community services, the Department is simply following the federal regulations that state that Medicaid recipients are responsible for paying their spend- down themselves. Defendants also note plaintiffs' assertion that they would not have to meet a spend-down if they were placed in a nursing home is incorrect. Defendants note that even if plaintiffs were eligible for nursing home care, they would likely pay as much, if not more for their care than their spend-down. This is because in Missouri, you must meet both income and resource requirements, be over the age of 65 or totally and permanently disabled and meet the level of care as determined by the Department of Health and Senior Services. Defendants state that what plaintiffs want is to receive medical care (the medical transportation and personal care services), regardless of whether they meet Medicaid eligibility requirements, basically a waiver of the spend-down. But, defendants state that nothing in the ADA, the Rehabilitation Act or the

Olmstead opinion authorizes the Court to waive or modify fundamental Medicaid eligibility requirements.

The Court finds that plaintiffs have failed to state a claim under either the ADA or the Rehabilitation Act. As noted above, under both the ADA and the Rehabilitation Act, in order to state a claim a plaintiff must show that he "(1) is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of [the public entity's] services, programs, or activities, or was otherwise subjected to discrimination by the [entity] and (3) that such exclusion, denial of benefits, or other discrimination, was by reason of his disability." Pettet v. May, 2012 WL 1377101, *3. Plaintiffs gloss over the qualification requirement by stating that they are qualified because they are capable of living in a community setting, want to continue living in their own homes and they qualify for services from the Missouri HealthNet program on a spend-down basis. But, that is the key point in this case. Plaintiffs only *qualify if they meet the spend-down.* As defendants have pointed out, Medicaid is a poverty program and because plaintiffs' incomes are too high, they do not meet the eligibility requirements outright, rather, they must incur a federally mandated deductible called a spend-down. Once they meet this requirement, then they are eligible to have Mo HealthNet pay for the cost of their medically necessary transportation costs or the cost of personal care services. But, until they meet this requirement they do not meet the definition of a "qualified individual" under the meaning of either the ADA or the Rehabilitation Act. As defendants note, "changing eligibility requirements, such as the maximum income level, is not for the courts, but rather for Congress and the legislature." (Defendants' Reply Suggestions, p. 2). Accordingly, because the Court finds that plaintiffs have failed to show that they are qualified individuals under either the

14
Case 2:12-cv-04163-FJG   Document 44   Filed 10/25/12   Page 14 of 15

ADA or the Rehabilitation Act, the Court finds that plaintiffs have failed to state a claim. Accordingly, the Court hereby **GRANTS** Defendants' Motion to Dismiss Plaintiffs' Complaint (Doc. # 26).

### C. Remaining Motions

In light of the Court's denial of the Motion for a Preliminary Injunction and dismissal of plaintiffs' Complaint, the Court hereby **DENIES** Plaintiffs' Motion for Leave to File Supplemental Declaration (Doc. # 34); **DENIES** Plaintiffs' Motion for Leave to File First Amended Complaint and to Add Party Plaintiff (Doc. # 40) and **DENIES AS MOOT** Plaintiffs' Motion for Expedited Hearing and/or Ruling on the Motion for a Preliminary Injunction (Doc. # 42).

## IV. CONCLUSION

Accordingly, for the reasons stated above, the Court hereby **DENIES** plaintiffs' Motion for a Preliminary Injunction(Doc. # 3); **GRANTS** Defendants' Motion to Dismiss for Failure to State a Claim (Doc. # 26); **DENIES** plaintiffs' Motion for Leave to File Supplemental Declaration; **DENIES** Plaintiff's Motion to File Amended Complaint and to Add Party Plaintiff (Doc. # 40) and **DENIES AS MOOT** plaintiffs' Motion to Expedite Hearing or Ruling (Doc. # 42).

Date: <u>October 25, 2012</u>　　　　　　　　　　**S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri　　　　　　　　　　　　Fernando J. Gaitan, Jr.
　　　　　　　　　　　　　　　　　　　　　　Chief United States District Judge